**AFFIRMED as MODIFIED and Opinion Filed July 5, 2024**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-22-01112-CR

**JONATHAN OLIVAREZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F19-57776**

## MEMORANDUM OPINION

Before Justices Molberg, Reichek, and Smith
Opinion by Justice Molberg

The jury found appellant Jonathan Olivarez guilty of aggravated assault with a deadly weapon, and the trial court assessed his punishment at thirty years' confinement. In seven issues, appellant argues (1) the evidence is factually insufficient to support the jury's rejection of his self-defense claim, (2) the evidence is legally insufficient to support the jury's rejection of his self-defense claim, (3) the trial court erred in allowing the victim to invoke the Fifth Amendment privilege against self-incrimination, (4) that Fifth Amendment ruling violated appellant's Sixth Amendment right to confrontation, (5) the trial court improperly admitted a

jail video call over his Fourth Amendment complaint, (6) the trial court improperly admitted photographs of his tattoos over his Fourth Amendment complaint, and (7) the trial court abused its discretion in allowing certain testimony about gangs and gang violence. The State raises cross-issues seeking to modify the trial court's judgment. For the reasons explained below, we modify the judgment and otherwise affirm in this memorandum opinion.

## Background

Vanessa Villarreal lived at her mother's house with her boyfriend, appellant. Her brother, Eric Cabello, was also staying at the house, dealing with heroin withdrawal. Around seven o'clock on the evening of August 25, 2019, Eric was sleeping and appellant asked Vanessa to borrow her car to run a quick errand. She agreed. Hours later, when appellant had not returned the car, she video called him and saw that others were in the car with him and he appeared disoriented; she believed he was drunk or high. At one in the morning, appellant called Vanessa and told her to come outside. She went outside and appellant told her he wrecked the car and showed her damage on the passenger side of the vehicle.

They began arguing, went inside and continued arguing, and appellant said he was going to leave. Vanessa and appellant were packing appellant's things when Eric exited the bedroom he had been sleeping in to see what was going on. Vanessa took Eric outside and showed him the vehicle's damage. She then went for a walk and called appellant's sister. Eric called her to reassure her that they would fix the

–2–

car and she could hear appellant in the background screaming. She was walking back to the house when she heard three or four rapid gunshots.

After running the rest of the way home, Vanessa observed Eric laying in the flower bed with his feet in the sidewalk, and appellant was striking him with a handgun. Eric was pale and she saw puddles of blood underneath his body. Vanessa pushed appellant away from Eric, who murmured or whispered at Vanessa to go inside. Vanessa said Eric did not have a weapon and appellant never appeared to be afraid of Eric. She said she thought appellant was angry rather than afraid. She went inside and called 911 after appellant left. She was afraid to tell the authorities that appellant was the perpetrator because she thought he was in the area and had possibly walked over to a neighbor's house. She was unsure if the neighbor would be on her side. Later at the hospital, she told the police that appellant was the perpetrator.

The trial court admitted State's Exhibit 6, a video from the house's surveillance camera. The video depicts Eric drape his shirt over the porch railing before he moves from the porch towards appellant, who is bent over and appears to be rummaging through his things on the lawn looking for something. Eric backs up three or four steps, and appellant stands up with a weapon in his hand. Eric is standing in place when appellant steps towards Eric and fires his weapon about three times at Eric, who falls backwards onto the ground. Appellant then hovers over Eric's body and strikes him with the firearm four times. Appellant puts his weapon back with his other belongings, then runs back towards Eric and kicks him.

Appellant bends over Eric, gestures at him, and appears to be yelling something. Appellant retrieves another weapon from his bag and strikes Eric with it when Vanessa arrives and pushes appellant away from Eric. Vanessa goes inside and appellant gestures angrily in the yard. Appellant takes his things and walks them out of view of the camera, and Vanessa is on the phone when she returns outside and checks on Eric. Appellant returns, gets his weapon and approaches Eric again but Vanessa shields Eric and appellant moves away. Appellant puts the gun back in his bag, picks up the rest of his things, and walks away.

Appellant called Vanessa and his sister from jail, and the call was admitted into evidence. Appellant asked Vanessa how many times he shot Eric, and he asked her to come bail him out of jail.

On cross-examination, Vanessa said Eric had been dealing with relapsing into drug use, including heroin, for months by August 2019. He was staying at the house because he could not get a place in rehab at the time. She said Eric was going through heroin withdrawals and he was agitated at time and the family decided he should not be alone. She denied observing anything that would indicate Eric was doing anything illegal in the house before the incident. During the day on August 25, Vanessa said when Eric was agitated, he was up and moving around and saying things that did not make sense, but she said she did not remember him making any threats. Vanessa said her mother kept guns in the home in a safe but that they had been removed from the house because Eric was staying there.

Vanessa said the argument with appellant woke Eric up. He was standing in the door to her room, asking questions, trying to figure out what was going on. She denied he was yelling at any point. Vanessa said neither Eric nor appellant was angry with the other, nor did they seem scared of each other. She said Eric was not angry that appellant was packing to leave, nor was he angry that appellant had wrecked Vanessa's car. Vanessa said she was crying and yelling but this did not make Eric angry—he remained calm. Vanessa said Eric was wearing a shirt and shorts when he emerged from their mother's bedroom.

Vanessa said she did not believe Eric is violent and she had not heard in the community about Eric's character trait for violence or nonviolence. But she said she was aware Eric had been convicted of aggravated robbery and burglary and sentenced to ten years in prison for those crimes. She was aware Eric had been a member of the prison gang called Tango Blast in the past but was unsure whether he was a member at the time of trial. Vanessa said she never saw any guns in the house other than appellant's on the night of the incident.

During a break in the testimony, appointed counsel for Eric told the trial court that he had "discussed everything with [Eric] regarding, if he testifies, what would take place, what would be asked, things like that. Also, in my belief -- and asked him about his Fifth Amendment right not to testify, if I think he would be able to do that, and I advised him I think he would." Counsel told the court Eric had decided to invoke his Fifth Amendment right not to incriminate himself. The trial court stated

"there will be no mention of him taking or pleading the Fifth Amendment in front of the jury." Counsel also stated he explained to the trial court in-camera Eric's reasons for invoking the Fifth Amendment, and the trial court confirmed they held an in-camera hearing and that the court decided the Fifth Amendment did apply. The record of the in-camera hearing is sealed and before us on appeal.

Officer Gretchen Rocha testified, among other things, she arrived at the scene and saw that Eric was bleeding profusely and was in and out of consciousness. She did not see any firearms or other weapons on the ground near Eric. Rocha had been canvassing the neighborhood to find surveillance footage from neighbors when she heard someone yelling for help, approached the area from where the sound of the voice was coming, and found an individual holding appellant down on the ground. The individual, who turned out to be Vanessa's other brother Estevan, said, "That's the shooter. That's him," referring to appellant. She apprehended appellant while Officer Aldo Rojo also approached the two and apprehended Estevan. Rojo said the two men were fighting before the officers showed up, but on cross-examination he said he did not see Estevan strike appellant.

Paramedics arrived and controlled Eric's bleeding, stabilized him, and rushed him to the hospital. Krystle Calderon, a firefighter, testified Eric was screaming and kept repeating, "Jonathan shot me." Eric had gunshot wounds to the head, right chest, both hips, and left hand. Dr. Vanessa Shifflette said he would have died had

he not received immediate medical treatment. He remained in the hospital for nine days.

A number of photographs were admitted during the testimony of Rebecca Kerr, a crime scene technician. During her cross-examination, defense counsel offered into evidence and the trial court admitted a photograph Kerr took of appellant that showed a red mark on the right of appellant's forehead. She also stated she had noted an injury to appellant's left eye. Kerr said her report did not note any injuries to Estevan's hands; she took pictures of his hands and did not see anything of note.

Appellant testified he had known Eric for about eighteen years, having grown up with him in the same neighborhood. He said, in 2019, Eric was about five feet tall and was stocky, weighing close to 200 pounds. Appellant said Eric told him that if he was not nice to Vanessa, he would be in serious trouble. On the morning of the day in question, appellant said Eric was intoxicated on Xanax and was calm all day. On the evening in question, appellant said he took Vanessa's car to help a friend move from Oak Cliff to Garland. After he returned and he and Vanessa were arguing, appellant said Eric woke up and Vanessa told him about the car and that appellant broke up with her. He said Eric was angry and shocked and began acting aggressively towards him. Appellant said his opinion of Eric's character was that he "can get dangerous" and he had a violent reputation in the community. As he was packing, appellant said Eric was telling him he was going to "whoop him" and "leave him bloody because he made his sister cry."

Appellant explained he was yelling when Eric was on the phone with Vanessa because he was trying to tell Vanessa he was sorry, not because he was angry with Eric. After Eric got off the phone with Vanessa, appellant said things got physical, and Eric struck appellant's face. Appellant told Eric he did not want to fight but wanted to pack his things and leave. Eric left the room, and appellant said he was worried Eric was going to retrieve the gun he and Eric kept in the house—separate from the guns Vanessa's mother had removed from the home—because Eric had asked for the gun earlier in the day. When Eric returned, appellant said Eric told him, "You thought I was playing. You thought I was playing when I was talking to you about what I would do." Appellant observed a handgun tucked into the waist of Eric's shorts. He interpreted this as a threat but said he tried "to be calm about it" and wanted to collect his belongings and leave. Appellant said Eric told him he was "going to leave me bloody" and that he "can't do it in the house." Appellant said Eric placed his gun on a table in the hallway, and appellant "quickly snatched it up." Eric went into the bathroom, and appellant started walking out of the house. Appellant placed his two bags on the grass and was looking for a shirt in one of the bags when Eric exited the house and said, "You think you're just going to leave without getting dealt with. It don't work like that." Appellant said he and Eric were both in the prison gang Tango Blast, so when he saw Eric take his shirt off, he knew "there was trouble," like he was "fixing to get really hurt bad." Although he did not see a gun in Eric's hand and he was unaware of any other guns in the house, appellant

testified he assumed Eric had a gun because Eric had told him that "he got something for me." That statement was a clear indication to him he was going to get shot and its meaning was common knowledge to him. But appellant also said it could mean he was going to get beat up.

Eric was yelling and screaming and gesticulating, which appellant said Eric did when he was angry. Appellant believed Eric was "fixing to do something to me." When asked why he pulled the gun out of his bag, appellant stated:

> Because he said that -- he goes, you've got -- you've got -- he said, oh, you've got a gun. He said, I'm going to take that gun away from you. I'm going to beat it, and I'm going to shoot you. That's how I do it. So I, instantly, knew, like, that was the drawing line. Like, I ain't -- I'm not leaving that spot without protecting myself.
>
> Q. Is that why you shot him?
>
> A. Yes, sir.
>
> Q. How come you shot him more than once?
>
> A. I just -- I just wanted to protect myself. I just started shooting.

Appellant was mad at Eric because he "put me in a corner" and appellant had to protect himself. He said he did not lose control but he was "real emotional." Appellant also testified that Eric constantly told him that if he hurt Vanessa, Eric would kill him. Given Eric's reputation, appellant took these statements to heart.

On cross-examination, appellant acknowledged he went to prison for aggravated robbery committed in 2014 and he was on parole on the day of this incident. He said he kept a gun in the room he slept in in the house, but was not supposed to have a gun with him. On the night in question, appellant said he

–9–

"smoked about two blunts" and this made him "really high" because he did not usually smoke.

After hearing closing arguments, the jury deliberated and returned a verdict of guilty on the charged offense. The trial court heard punishment evidence, pertinent parts of which we will discuss below, and assessed punishment at thirty years' confinement. This appeal followed.

**Discussion**

*A. Sufficiency of the evidence to support the jury's rejection of appellant's self-defense claim*

Appellant raises both factual and legal sufficiency of the evidence complaints. In assessing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This standard recognizes the trier of fact as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence, and on review, we determine whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all of the evidence. *Adames v. State*, 353 S.W.3d

854, 860 (Tex. Crim. App. 2011). We presume that the factfinder resolved any conflicting inferences in favor of the verdict; we defer to that resolution, and we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006).

Although the factual sufficiency standard remains applicable in review of affirmative defenses, *see Matlock v. State*, 392 S.W.3d 662, 664, 667 (Tex. Crim. App. 2013), self-defense is not an affirmative defense and, therefore, the "factual-sufficiency standard does not apply when we conduct a review of the sufficiency of the evidence to support the jury's implied rejection of a defendant's claim of self-defense," *Butler v. State*, No. 05-17-00279-CR, 2018 WL 360237, at *4 (Tex. App.—Dallas Jan. 11, 2018, pet. ref'd) (mem. op., not designated for publication). Given this, we resolve appellant's first issue raising factual sufficiency against him.

We now turn to review the sufficiency of the evidence to support the jury's verdict. Appellant does not argue the State failed to prove the elements of aggravated assault but only challenges the jury's rejection of his self-defense claim, arguing his testimony showed he responded to "an immediate threat to cause violence to appellant and [Eric] made movements of aggression based on [his] anger toward Appellant," thus establishing the justification of self-defense. When it comes

–11–

to sufficiency review of a self-defense claim, the court of criminal appeals has stated

the following:

> [I]n a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). By contrast, the State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913). Thus, "[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914.

*Braughton*, 569 S.W.3d at 608–09.

A person commits aggravated assault if the person commits assault as defined in penal code § 22.01 and the person uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE § 22.02(a)(2). However, it is a defense to prosecution that the conduct in question is justified under Chapter 9 of the penal code. *Id.* § 9.02. A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id.* § 9.31(a). A

–12–

person is justified in using deadly force against another if the actor would be justified in using force against the other under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a).

We conclude sufficient evidence supports the jury's verdict because, even had the jury believed appellant's testimony, which it need not have done, *see Braughton*, 569 S.W.3d at 612 ("jury is permitted to reject even uncontradicted defensive testimony, so long as its rejection of that evidence was rational in light of the remaining evidence in the record and is not contradicted by indisputable objective facts"), it could have rationally rejected appellant's self-defense claim. In appellant's telling, Eric had a gun at one point when he was in the house, but Eric put the gun down when he went into the bathroom, at which point appellant took the gun. Appellant acknowledged he took the gun and that he did not see Eric with another firearm or deadly weapon when he was outside. Given this and the other evidence, including the surveillance video showing that Eric was not using or attempting to use deadly force against appellant when he was shot, we conclude the jury could have rationally found that even if appellant believed it was immediately necessary to protect himself against Eric's use or attempted use of unlawful deadly force, such belief was not reasonable. *Cf. Harris v. State*, 668 S.W.3d 83, 90 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (en banc) (concluding jury could have rationally rejected self-defense claim even when complainant was armed and had

–13–

indicated a willingness to use force against appellant because it "could have found that appellant's knowledge of these facts did not support a reasonable belief that deadly force was immediately necessary at the time of the shooting, as [complainant] had not yet drawn his gun or otherwise threatened to use it at that time"). Appellant's second issue is overruled.

### B. Fifth Amendment right not to testify

Third, appellant argues the trial court erred in ruling that Eric could invoke his Fifth Amendment right not to testify. No person shall be compelled in any criminal case to be a witness against himself. U.S. CONST. amend. V. This privilege extends to witnesses who have reasonable cause to apprehend danger from a direct answer, and it extends to answers that would in themselves support a conviction, as well as to those that would merely furnish a link in the chain of evidence needed to prosecute the claimant. *Ohio v. Reiner*, 532 U.S. 17, 20–21 (2001). The trial court is required to make an inquiry into the reasonableness of a witness's invocation of the privilege, and in determining the propriety of the invocation, the court should be governed by the facts in evidence and the peculiarities of the case. *Walters v. State*, 359 S.W.3d 212, 215, 216 (Tex. Crim. App. 2011). A trial court "cannot compel a witness to answer unless it is perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken in asserting the privilege, and that the answer cannot possibly tend to incriminate the witness." *Keller v. State*, No. 03-13-00501-CR, 2014 WL 6617143, at *10 (Tex. App.—Austin Nov. 20, 2014, no

–14–

pet.) (mem. op., not designated for publication) (quoting *Grayson v. State*, 684 S.W.2d 691, 696 (Tex. Crim. App. 1984)). We review a trial court's decision to uphold a witness's claim of privilege for an abuse of discretion. *Tugler v. State*, No. 05-17-00429-CR, 2018 WL 3387383, at *7 (Tex. App.—Dallas July 12, 2018, no pet.) (mem. op., not designated for publication).

Here, before appellant rested, he objected on the record to the trial court's prior ruling indicating it would uphold Eric's assertion of the Fifth Amendment right to avoid being a witness against himself. Counsel for appellant stated:

> My first objection is that I don't believe that my client's Sixth Amendment right to confrontation with his accuser, the complaining witness, gives way to the witness's Fifth Amendment privilege not to incriminate himself.

He also argued as follows:

> Mr. Cabello's concerns about being revoked from probation would not give rise to a Fifth Amendment privilege because he would not be incriminating himself because a probationer is situated differently as to the law than a criminally – criminal accused, or a defendant. Mr. Cabello has already incriminated -- incriminated himself with a family-violence offense for which he is on a 10-year probation right now. He pled guilty, and he judicially confessed it. So that is the end of his Fifth Amendment privilege as to the case. Now that he's on probation, that's administrative as to the final disposition of the case, and his terms and conditions of probation are just those, so that he can be rehabilitated.

Defense counsel also stated, "if the concern is revocation, then Mr. Cabello doesn't even have a Fifth Amendment privilege to assert."

The trial court held an in-camera hearing on Eric's Fifth Amendment invocation, and the sealed record of the hearing is before us on appeal. At the

–15–

hearing, counsel for Eric articulated multiple reasons why Eric's testimony would open him up to criminal liability. We have reviewed the sealed record and conclude the trial court did not abuse its discretion in upholding Eric's assertion of the Fifth Amendment privilege. *See Matamoros v. State*, No. 13-19-00505-CR, 2021 WL 2371521, at *4 (Tex. App.—Corpus Christi–Edinburg June 10, 2021, pet. ref'd) (mem. op., not designated for publication) ("We have reviewed the sealed record of the in-camera hearing, and we note it supports the trial court's ruling."). In reaching this conclusion, we necessarily reject appellant's arguments speculating that Eric's concerns about testifying related only to community supervision. Counsel's proffer regarding the potential for self-incrimination was not limited to concerns about revocation of community supervision but to criminal liability in general. We overrule appellant's fourth issue.

In his next issue, appellant contends that the ruling complained of in the prior issue denied appellant's Sixth Amendment right to confront the complainant. The accused shall enjoy the right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. U.S. CONST. amend. VI. A defendant's Sixth Amendment right to compulsory process of witnesses does not trump an individual's Fifth Amendment privilege against self-incrimination. *Tugler v. State*, No. 05-17-00429-CR, 2018 WL 3387383, at *7 (Tex. App.—Dallas July 12, 2018, no pet.) (mem. op., not designated for publication); *see also Hall v. State*, 475 S.W.2d 778, 780 (Tex. Crim. App. 1972). Similarly, a defendant's Sixth

–16–

Amendment right to confront witnesses cannot overcome a witness's valid assertion of the Fifth Amendment privilege. *Clede v. State*, No. 04-21-00293-CR, 2022 WL 3909083, at *3 (Tex. App.—San Antonio Aug. 31, 2022, pet. ref'd) (mem. op., not designated for publication); *Melonson v. State*, No. 09-19-00034-CR, 2020 WL 5805596, at *2 (Tex. App.—Beaumont Sept. 30, 2020, no pet.) (mem. op., not designated for publication); *Sotelo v. State*, No. 11-17-00118-CR, 2019 WL 2220572, at *4 (Tex. App.—Eastland May 23, 2019, pet. ref'd) (mem. op., not designated for publication); *United States v. Ramos*, 537 F.3d 439, 448 (5th Cir. 2008).

We find no cases, and appellant directs us to none, holding otherwise. Moreover, in the record before us, the State never called Eric as a witness, and he therefore was not "a witness against" appellant for confrontation purposes. *See* U.S. CONST. amend. VI. Accordingly, we reject appellant's contention and overrule his fourth issue.

### C. Evidentiary complaints

In his fifth issue, appellant argues the trial court abused its discretion in admitting during the punishment phase of trial a video of appellant on a video call from jail. Appellant complains the Fourth Amendment required the exclusion of the video because the State did not prove appellant consented to the video call being recorded.

Investigator Raul Obregon testified that jail video calls or visits are recorded by the county using a system called Securus. He said when an inmate logs in for a video call, a message appears to the inmate stating the call is being monitored and recorded, and moreover, in appellant's case, he heard appellant state on other calls and visits that he understood jail calls are recorded. Obregon said he used appellant's book-in number to access appellant's calls and retrieved a video visit from April 8, 2022. Appellant objected to the video being admitted on Fourth Amendment grounds, arguing the video was obtained from a warrantless search or seizure and no evidence showed he had waived his Fourth Amendment rights.

As we have stated previously:

The Fourth Amendment prohibits unreasonable searches, which occur when the government violates a subjective expectation of privacy that society recognizes as objectively reasonable. *See Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Whether a subjective expectation of privacy is one that society recognizes as being objectively reasonable is a question of law that we review de novo. *See Villarreal*, 935 S.W.2d at 138 n.5.

As a general matter, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates ... required to ensure institutional security and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984). Because "society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security," it is accepted that a loss of privacy is an "inherent incident[ ] of confinement." *Id.*

*Woodberry v. State*, No. 05-18-00728-CR, 2019 WL 2863867, at \*7–8 (Tex. App.—Dallas July 2, 2019, no pet.) (mem. op., not designated for publication).

–18–

Applying those principles in *Woodberry*, we noted that "courts have uniformly rejected the contention that an inmate has a legitimate expectation of privacy in phone calls with non-lawyers, at least where, as here, there is notice that the calls are monitored" and concluded the appellant "had no objectively reasonable expectation of privacy in his outgoing phone calls from the jail." *Id.* at *8. The pertinent facts are the same here: appellant was an inmate in the jail when he participated in the video call, at the beginning of which he was notified it was being recorded and monitored. We follow *Woodberry* and conclude appellant had no objectively reasonable expectation of privacy in the video call made while he was in jail and the trial court did not abuse its discretion in overruling appellant's Fourth Amendment objection. Appellant's fifth issue is overruled.

Sixth, appellant argues the trial court abused its discretion in admitting during the punishment phase of trial State's Exhibits 213 through 221, photographs taken of appellant shirtless at the jail, depicting the tattoos covering his front torso, neck, and arms. Appellant argues they were erroneously admitted because they were taken without warrant, court order, or any written waiver of appellant's Fourth Amendment rights.

Detective Rocky Pena, a detective with the sheriff's office, testified he interviewed appellant in jail in 2020 after receiving "intel from the jail" regarding gang activity. After interviewing appellant, Pena said he determined appellant "met the criteria" of belonging to a gang, so he documented him as such in the statewide

–19–

database run by the department of public safety. Pena said appellant was a member of criminal street gangs Four Corners and Oak Cliff Town. Pena said he took photographs of appellant with appellant's permission, and the State offered into evidence exhibits 213 through 221. Appellant objected, noting they were not taken with a warrant or court order, and there was no documentation of consent. The trial court overruled appellant's objection.

As to the photographs of appellant's forearms and neck, we conclude the trial court did not err in admitting them because appellant has no reasonable expectation of privacy in tattoos on commonly visible parts of his body. *See Garcia v. State*, 239 S.W.3d 862, 868 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *U.S. v. Dionisio*, 410 U.S. 1, 14–15 (1973)) (concluding criminal defendant had no reasonable expectation of privacy concerning his tattoos appearing on his neck, forearms, and calves).

As to the remaining photographs depicting tattoos on appellant's chest and abdomen, we assume without deciding they were erroneously admitted and conclude any error did not harm appellant. The erroneous admission of evidence obtained in violation of the Fourth Amendment is constitutional error analyzed under Texas Rule of Appellate Procedure 44.2(a). TEX. R. APP. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Under that rule, "we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *Holmes*

*v. State*, 323 S.W.3d 163, 173–74 (Tex. Crim. App. 2009). The question for the reviewing court is not whether the verdict was supported by the evidence but focuses instead on the likelihood the constitutional error was actually a contributing factor in the fact finder's deliberations in arriving at its verdict. *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020). In making this determination, factors we consider include, but are not limited to, the nature of the error, whether the error was emphasized by the State, the probable implications of the error, and the weight the fact finder would likely have assigned to the error in the course of its deliberations. *Id.*

Here, the State did not emphasize any error in its closing argument, which was limited to reiterating the nature of the offense charged, appellant's prior criminal acts, and his conduct in jail. However, another witness, Captain Devin Gonzales testified about the tattoos based upon reviewing the photographs in question. He said a tattoo reading "Blast Life" on appellant's upper chest and a Dallas Stars emblem on appellant's shoulder were suggestive of membership in Tango Blast; tattoos on appellant's chest and abdomen of a smoking skeleton, a tattoo reading "4 Corners," and a tattoo of the head of a clown with the numeral four on its forehead were suggestive of membership in Four Corners; and a tattoo on appellant's right upper shoulder reading "4C" above a skull was also suggestive of Four Corners membership. Other evidence, however, admitted without objection also proved appellant's gang memberships. Pena testified he determined appellant was a

–21–

member of Four Corners and Oak Cliff Town, and appellant himself testified he was a member of Tango Blast. Additionally, Gonzales testified that during the jail video call discussed above appellant made hand signs for Four Corners, Oak Cliff Town, and Tango Blast, and that other tattoos on commonly visible parts of appellant's body—his neck, forearms, and hands—were suggestive of membership in Tango Blast (Dallas Mavericks emblem on hand), Oak Cliff Town ("OCT" on back of neck), and Four Corners ("4C" on forearm). Given this, we conclude any error in the admission of photographs of tattoos on appellant's chest, abdomen, and shoulders was not a contributing factor in determining appellant's punishment and was harmless under rule 44.2(a). *Cf. Lopez v. State*, 615 S.W.3d 238, 265 (Tex. App.—El Paso 2020, pet. ref'd) ("the erroneous admission of evidence is harmless under Texas Rule of Appellate Procedure 44.2(a) where it is cumulative of other evidence admitted at trial").

Finally, appellant argues the trial court abused its discretion in allowing Gonzales to testify about gangs and gang violence. Gonzales testified the prison gang Tango Blast has a propensity to commit violent crimes. He said it was possible for someone to be both a member of Tango Blast as well as a local gang. When asked whether it was "uncommon to see gang-on-gang violence or gang members who are part of the same gang committing violent acts against one another," appellant objected, stating the question went beyond what the case law allowed because it went beyond the character or reputation of the gang to "the acts of violence

–22–

that they've committed." The trial court overruled the objection. The detective then answered it was not uncommon.

Article 37.07 of the code of criminal procedure provides as follows:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1). As a general rule, evidence the defendant is an active member of a gang that regularly engages in criminal activities is relevant to show the defendant's character for sentencing purposes. *Garcia v. State*, No. 05-19-01165-CR, 2020 WL 4381770, at *3 (Tex. App.—Dallas July 31, 2020, no pet.) (mem. op., not designated for publication) (citing *Beham v. State*, 559 S.W.3d 474, 479 (Tex. Crim. App. 2018); *Beasley v. State*, 902 S.W.2d 452, 456 (Tex. Crim. App. 1995) (plurality op.)).

We cannot conclude the trial court abused its discretion in allowing the State's witness to testify about the kinds of violent acts Tango Blast engaged in. In *Beasley*, for example, a police officer testified, among other things, that appellant's gang "engage[d] in violent and criminal activity" and added that specifically, "[t]heir cause is violence, criminal activity such as drug trafficking, robberies, witness

–23–

intimidation." *Beasley*, 902 S.W.2d at 454. The court of criminal appeals concluded it was "essential for the jury to know the types of activities the gang generally engages in so that they can determine if his gang membership is a positive or negative aspect of his character, and subsequently his character as a whole." *Id.* at 456. The court in *Beham* later reiterated this point, noting that "evidence that the defendant is an active member of a gang that regularly engages in criminal activities" "is almost always relevant for sentencing purposes." *Beham*, 559 S.W.3d at 479. If the State offers evidence of gang membership but fails to present evidence of the kinds of activities the gang engages in, such evidence is "unhelpful and irrelevant, and may even be constitutionally odious." *Id.* We overrule appellant's final issue.

### D. Judgment modification

The State raises three proposed judgment modifications. We may modify the trial court's judgment to make the record speak the truth when we have the necessary information to do so. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). The State points out that the judgment incorrectly reflects that, first, appellant pleaded guilty to the offense, and second, the jury assessed punishment. We agree. Accordingly, we will modify the judgment to reflect that appellant pleaded not guilty to the offense and that the judge assessed punishment.

The State also argues the trial court erroneously failed to assess the full $105 local consolidated fee under § 134.101(a) of the local government code. Rather than assess one "local consolidated fee," the trial court assessed a $40 clerk's fee, $1 jury

fee, $10 courthouse security fee, $25 county records management fee, and $25 specialty court fee, for a total of $101. The trial court also assessed "consolidated state fees" of $185.

We agree the court costs assessed here were incorrect but disagree with the State as to why. The Cost Act, which created § 134.101, also provided that, "[e]xcept as otherwise provided by this Act, the changes in law made by this Act apply only to a cost, fee, or fine on conviction for an offense committed on or after the effective date of this Act." *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, 2019 Tex. Gen. Laws 3982. "An offense committed before the effective date of this Act is governed by the law in effect on the date the offense was committed, and the former law is continued in effect for that purpose." *Id.* The Act's effective date was January 1, 2020. *Id.*

The offense on appeal here was committed August 25, 2019—before the effective date of the Cost Act—and so we conclude the trial court was correct not to assess the local consolidated fee. *Cf. Contreras v. State*, No. 05-20-00185-CR, 2021 WL 6071640, at *6 (Tex. App.—Dallas Dec. 23, 2021, no pet.) (mem. op. on reh'g).

Instead, we must consider whether the "law in effect on the date of the offense" supports the particular fees assessed by the trial court. The $1 jury fee and $25 specialty court fee were created by the Cost Act and thus must be removed from the bill of costs. *See id.* at *9 n.7. However, the $40 clerk's fee was required by the version of article 102.005(a) in effect at the time of the offense, and the $25 county

–25–

records management fee was required by article 102.005(f). *See* TEX. CODE CRIM. PROC. art. 102.005 (2019). Article 102.017(a) required a $5 courthouse security fee, half of what the trial court assessed here. *See id.* art. 102.017(a) (2019). Additionally, the trial court failed to assess the $4 technology fee required by the version of article 102.0169(a) in effect at the time this offense was committed. *See id.* art. 102.0169(a) (2019) (defendant convicted in district court "shall pay a $4 county and district court technology fee as a cost of court").

Finally, we observe that the trial court assessed the $185 consolidated fee under § 133.102 as amended by the Cost Act. However, the version of § 133.102 effective in 2019 called for a $133 consolidated fee. *See* TEX. LOC. GOV'T CODE § 133.102 (2019).

Accordingly, we will not disturb the $40 clerk's fee and the $25 county records management fee; we will modify the courthouse security fee to be $5 and the consolidated state fees to be $133; we will remove the $1 jury fee and the $25 specialty court fee; and we will add the $4 technology fee. We will modify the judgment to reflect a total of $207 in court costs.

## Conclusion

Having overruled appellant's issues, we affirm the judgment of the trial court as modified.

/Ken Molberg/

KEN MOLBERG

Do Not Publish
TEX. R. APP. P. 47.2(b).
221112F.U05

JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JONATHAN OLIVAREZ, Appellant

No. 05-22-01112-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas Trial Court Cause No. F19-57776. Opinion delivered by Justice Molberg. Justices Reichek and Smith participating.

Based on the Court's opinion of this date, we **MODIFY** the trial court's judgment and bill of costs as follows:

to delete "Guilty" and replace it with "Not Guilty" under "Plea to Offense";

to delete "Jury" and replace it with "Judge" under "Punishment Assessed By";

to delete "$286" and replace it with "$207" under "Court Costs"; and

in the bill of costs, to delete the $1 jury fee and the $25 specialty court fee, to modify the courthouse security fee to be $5 and the consolidated state fees to be $133, and to add the $4 technology fee.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered July 5, 2024